No. 21-1039 (L), 21-1082

---

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

WILD VIRGINIA, SIERRA CLUB, APPALACHIAN VOICES, THE
WILDERNESS SOCIETY, PRESERVE CRAIG, SAVE MONROE,
INDIAN CREEK WATERSHED ASSOCIATION, and THE MONACAN
INDIAN NATION,

*Petitioners,*

v.

UNITED STATES FOREST SERVICE, AN AGENCY OF THE
UNITED STATES DEPARTMENT OF AGRICULTURE; JIM
HUBBARD, IN HIS OFFICIAL CAPACITY AS UNDER SECRETARY
FOR NATURAL RESOURCES AND ENVIRONMENT, UNITED
STATES DEPARTMENT OF AGRICULTURE; KEN ARNEY, IN HIS
OFFICIAL CAPACITY AS REGIONAL FORESTER OF THE
SOURTHERN REGION; UNITED STATES BUREAU OF LAND
MANAGEMENT, AN AGENCY OF THE U.S. DEPARTMENT OF THE
INTERIOR; DAVID L. BERNHARDT, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF THE INTERIOR; MITCHELL LEVERETTE, IN
HIS OFFICIAL CAPACITY AS STATE DIRECTOR, BUREAU OF
LAND MANAGEMENT, EASTERN STATES,

*Respondents,*

MOUNTAIN VALLEY PIPELINE, LLC,

*Respondent-intervenor.*

---

On Petition for Review of Actions of the U.S. Forest Service and U.S.
Bureau of Land Management

---

# PETITIONERS' RULE 30(c) PAGE PROOF OPENING BRIEF

---

Dated: April 15, 2021

Nathan Matthews                    Ankit Jain
Sierra Club                        Sierra Club
2101 Webster St., Suite 1300       50 F St. NW, Eighth Floor
Oakland, CA 94612                  Washington, DC 20001
415-977-5695                       571-435-5914
nathan.matthews@sierraclub.org     ankit.jain@sierraclub.org


Derek O. Teaney
Benjamin Luckett
APPALACHIAN MOUNTAIN ADVOCATES, Inc.
P.O. Box 507
Lewisburg, West Virginia 24901
304-646-1182
dteaney@appalmad.org
bluckett@appalmad.org

*Counsel for Wild Virginia, Sierra Club, Appalachian Voices, The
Wilderness Society, Preserve Craig, Save Monroe, and Indian Creek
Watershed Association*


William J. Cook
Special Counsel
Cultural Heritage Partners, PLLC
2101 L Street NW, Suite 800
Washington, DC 20037
843-801-3366
will@culturalheritagepartners.com

*Counsel for the Monacan Indian Nation*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1039          Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Wild Virginia
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?          ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nathan Matthews                         Date:        1/28/2021

Counsel for: Wild Virginia

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1039           Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)

who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nathan Matthews                    Date: _____1/28/2021_____

Counsel for: Sierra Club

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1039          Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Appalachian Voices
(name of party/amicus)

who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?          ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nathan Matthews                        Date:        1/28/2021

Counsel for: Appalachian Voices

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1039       Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Wilderness Society
(name of party/amicus)

who is _____ Petitioner _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                       ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                 ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                 ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?         ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nathan Matthews                               Date:            1/28/2021

Counsel for: Wilderness Society

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-1039          Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Preserve Craig
(name of party/amicus)


who is          Petitioner          , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nathan Matthews                     Date: _____1/28/2021_____

Counsel for: Preserve Craig

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1039          Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Save Monroe
(name of party/amicus)

who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                      ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
        If yes, identify entity and nature of interest:


5.     Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:


6.     Does this case arise out of a bankruptcy proceeding?                       ☐ YES ☑ NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.


7.     Is this a criminal case in which there was an organizational victim?        ☐ YES ☑ NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ Nathan Matthews                          Date: _____1/28/2021_____

Counsel for: Save Monroe

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1039          Caption: Wild Virginia v. U.S. Forest Service

Pursuant to FRAP 26.1 and Local Rule 26.1,

Indian Creek Watershed Association
(name of party/amicus)

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nathan Matthews                    Date:        1/28/2021

Counsel for: Indian Creek Watershed Association

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-1039_     Caption: _Wild Virginia v. U.S. Forest Service_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Monadan Indian Nation_
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: William J. Cook                                    Date:        April 15, 2021

Counsel for: Monacan Indian Nation

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

I.     INTRODUCTION ................................................................ 1

II.    JURISDICTIONAL STATMENT ...................................... 4

III.   STATEMENT OF ISSUES ................................................. 6

IV.    STATEMENT OF THE CASE .......................................... 7

   A.   Statutory and Regulatory Background .......................... 7

      1.   National Forest Management Act and Forest Service
           Regulations.............................................................. 7

      2.   Mineral Leasing Act................................................ 9

      3.   National Environmental Policy Act ...................... 10

      4.   National Historic Preservation Act....................... 12

   B.   Jefferson National Forest and the Forest Plan ........... 13

   C.   Mountain Valley Pipeline ........................................... 15

      1.   Prior Litigation ..................................................... 16

      2.   Current Forest Service and BLM Decisions ......... 20

      3.   The Approved Pipeline Project .............................. 21

V.     SUMMARY OF ARGUMENT........................................... 23

VI.    ARGUMENT ....................................................................... 26

   A.   Standard of Review....................................................... 26

   B.   The Forest Service's Decision to Skip Predecisional Review Is
        Unlawful Because the Pipeline Is Not "Proposed" by the Under
        Secretary........................................................................ 27

C.  The Agencies Violated the NHPA by Failing to Consult with the Monacan Indian Nation .................................................................. 31

  1.  Monacans' Request for Consultation ................................... 33

  2.  The Agencies' Actions Did Not Satisfy the NHPA .............. 36

D.  The Agencies Failed to Take a Hard Look at Sedimentation and Erosion ........................................................................................ 39

  1.  The Sediment Modeling Relies on Unsupported and Implausible Assumptions ..................................................... 40

  2.  Evidence of the Pipeline's Actual Impacts Indicates that the Model Is Unreasonable, but the Agencies Failed to Address this Evidence ........................................................................ 47

  3.  The Agencies Failed to Address Whether Erosion and Sedimentation Would Violate Water Quality Standards, in Violation of NEPA, the Mineral Leasing Act, and the Forest Planning Rule ........................................................................ 54

E.  The Agencies Failed to Take A Hard Look at Stream Crossings 60

F.  The Agencies Failed to Consider All Reasonable Alternatives or to Justify Rejecting Alternative Routes ....................................... 65

  1.  The SEIS Fails to Meaningfully Consider Off-Forest Route Alternatives ........................................................................... 66

  2.  The SEIS Fails to Demonstrate that Rejection of Certain Alternatives is Justified ........................................................ 69

G.  The Forest Service Violated the 2012 Planning Rule ................. 73

VII.  CONCLUSION ...................................................................... 79

CERTIFICATE OF COMPLIANCE ........................................... 81

CERTIFICATE OF SERVICE ..................................................... 82

# TABLE OF AUTHORITIES

**Cases**

*Carcieri v. Salazar,*
  555 U.S. 379 (2009) ................................................................71

*City of Sausalito v. O'Neill,*
  386 F.3d 1186 (9th Cir. 2004) ...............................................18

*City of Tacoma v. FERC,*
  460 F.3d 53 (D.C. Cir. 2006) ..................................................12

*Cowpasture River Pres. Ass'n v. U.S. Forest Serv.,*
  911 F.3d 150 (4th Cir. 2018) ...............................1, 25, 31, 65, 66, 67, 78

*Dubois v. U.S. Dep't of Agric.,*
  102 F.3d 1273 (1st Cir. 1996) ...................................60, 64, 65

*Epic Sys. Corp. v. Lewis,*
  138 S. Ct. 1612 (2018) ............................................................27

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,*
  887 F.3d 906 (9th Cir. 2018) ...........................................70, 71

*Havasupai Tribe v. Provencio,*
  906 F.3d 1155 (9th Cir. 2018) ...............................................38

*Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs,*
  702 F.3d 1156 (10th Cir. 2012) .....................................70, 71, 72

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
  305 F.3d 957 (9th Cir. 2002) ...........................................47, 53

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) ..........................................27, 28, 31

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ..................................................................6

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) .................................................................. 63

*Mass. v. EPA,*
  549 U.S. 497 (2007) .................................................................. 36

*Md. Conservation Council, Inc. v. Gilchrist,*
  808 F.2d 1039 (4th Cir. 1986) ................................................ 17

*Mejia v. Sessions,*
  866 F.3d 573 (4th Cir. 2017) .................................................. 27

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.,*
  677 F.3d 596 (4th Cir. 2012) .................................................. 42

*Ohio River Valley Envtl. Coal. v. Kempthorne,*
  473 F.3d 94 (4th Cir. 2006) .................................................... 44

*Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC,*
  845 F.3d 133 (4th Cir. 2017) .................................................. 55

*Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, MD,*
  268 F.3d 255 (4th Cir. 2002) .............................................. 4, 5

*Presidio Hist. Ass'n v. Presidio Tr.,*
  811 F.3d 1154 (9th Cir. 2016) ................................................ 12

*PUD No. 1 of Jefferson Cty. v. Wash. Dept. of Ecology,*
  511 U.S. 700 (1994) .................................................................. 55

*Pueblo of Sandia v. United States,*
  50 F.3d 856 (10th Cir. 1995) .................................................. 37

*Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior,*
  755 F.Supp.2d 1104 (S.D. Cal. 2010) .................................... 37

*Romero v. Barr,*
  937 F.3d 282 (4th Cir. 2019) .............................................. 27, 28

*S. Appalachian Mountain Stewards v. Red River Coal Co., Inc.,*
  420 F.Supp.3d 481 (W.D. Va. 2019) ...................................... 57

*Sierra Club v. Sigler,*
  695 F.2d 957 (5th Cir. 1983) .............................................. 69

*Sierra Club v. State Water Control Bd.,*
  898 F.3d 383 (4th Cir. 2018) .............................................. 59

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  905 F.3d 285 (4th Cir. 2018) .............................................. 18

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  981 F.3d 251 (4th Cir. 2020) .............................................. 18

*Sierra Club v. U.S. Forest Serv.,*
  897 F.3d 582 (4th Cir. 2018) .................. 1, 2, 4, 8, 11, 17, 20, 21, 22, 25,
  .......................................... 26, 31, 38, 40, 42, 46, 53, 65, 67

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
  140 S. Ct. 1837 (2020) ....................................................... 1

*Wild Va. v. U.S. Dept. of Interior,*
  Case 19-1866, ECF No. 41 (4th Cir., Oct. 11, 2019) ............... 19

## Statutes

15 U.S.C. § 717r ............................................................... 4

16 U.S.C. § 1604 ............................................................... 7

30 U.S.C. § 185 ...................................................... 9, 10, 54, 69

42 U.S.C. § 4332 ............................................................. 10

5 U.S.C. § 706 .......................................................... 4, 79

54 U.S.C. § 300320 .......................................................... 38

54 U.S.C. § 302706........................................................................12, 31

54 U.S.C. § 306108................................................................................12

Pub. L. No. 115-121 (2018)..................................................................5


## Regulations

36 C.F.R. § 218.12...........................................................................9, 27

36 C.F.R. § 218.13...........................................................................9, 27

36 C.F.R. § 218.7.............................................................................9, 27

36 C.F.R. § 219.10...........................................................................8, 74

36 C.F.R. § 219.11...........................................................................8, 74

36 C.F.R. § 219.13...........................................................9, 29, 74, 76, 78

36 C.F.R. § 219.15................................................................................7

36 C.F.R. § 219.16................................................................................8

36 C.F.R. § 219.3.......................................................................8, 48, 54

36 C.F.R. § 219.4................................................................................8

36 C.F.R. § 219.51..............................................................................30

36 C.F.R. § 219.62..............................................................................29

36 C.F.R. § 219.7................................................................................9

36 C.F.R. § 219.8..........................................................8, 74, 75, 76, 77

36 C.F.R. § 219.9...........................................................................8, 74

36 C.F.R. § 251.54..............................................................................66

36 C.F.R. § 800.1 .................................................................. 13

36 C.F.R. § 800.14 ................................................................ 13

36 C.F.R. § 800.16 ................................................................ 32

36 C.F.R. § 800.2 ........................................................ 12, 32, 37

36 C.F.R. § 800.3 ................................................................. 32

36 C.F.R. § 800.4 ....................................................... 13, 32, 37

36 C.F.R. § 800.5 ........................................................... 13, 32

36 C.F.R. § 800.6 ........................................................... 13, 32

36 C.F.R. Part 218 ................................................................. 9

40 C.F.R. § 1501.5 (2019) ...................................................... 11

40 C.F.R. § 1501.6 (2019) ...................................................... 11

40 C.F.R. § 1502.14 (2019) ................................................ 11, 64

40 C.F.R. § 1502.24 (2019) ..................................................... 47

40 C.F.R. § 1502.9 (2019) ...................................................... 12

40 C.F.R. § 1506.3 (2019) ...................................................... 11

40 C.F.R. § 1508.8 (2019) ...................................................... 54

40 C.F.R. § 230.10 ............................................................... 70

40 C.F.R. § 230.3 ................................................................. 70

43 C.F.R. § 2881.2 .......................................................... 60, 65

43 C.F.R. § 2884.23 .............................................................. 66

43 C.F.R. § 2884.26 .............................................................. 10

9 Va. Admin. Code § 25-260-20(A) ............................................. 55

9 Va. Admin. Code § 25-260-30 .................................................. 55


## Other Authorities

Forest Serv. Manual 2703.2 ......................................................... 66

Forest Service, Final Rule: National Forest System Land Management
   Planning ("2012 Planning Rule"),
   77 Fed. Reg. 21,162 (Apr. 9, 2012) ............................. 8, 30, 77

Forest Service, Proposed Rule: Project-Level Predecisional
   Administrative Review Process,
   77 Fed. Reg. 47,337 (Aug. 8, 2012) ....................................... 30

Forest Service: Proposed Rule, National Forest System Land
   Management Planning ("2016 Amendment"),
   81 Fed. Reg. 70,373 (Oct. 12, 2016) ................................. 8, 77

*Meriam-Webster Dictionary Online: Propose* ......................... 28

*The American Heritage Dictionary: Propose* ........................... 28

## I.  INTRODUCTION

Wild Virginia, Sierra Club, Appalachian Voices, The Wilderness Society, Preserve Craig, Save Monroe, Indian Creek Watershed Association, and the Monacan Indian Nation challenge the Forest Service and Bureau of Land Management's ("BLM") renewed decisions to allow the Mountain Valley Pipeline ("Pipeline") to cross 3.5 miles of the Jefferson National Forest.

Both agencies initially approved the Pipeline in 2017. This Court vacated those approvals in 2018, holding that the agencies violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Mineral Leasing Act based on their treatment of sedimentation concerns, the Forest Service's Planning Rule, and route choice. *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 606 (4th Cir.), *reh'g granted in part*, 739 F. App'x 185 (4th Cir. 2018); *see also Cowpasture River Pres. Ass'n v. U.S. Forest Serv.*, 911 F.3d 150, 158 (4th Cir. 2018), *rev'd and remanded on other grounds sub nom. U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837 (2020) (vacating parallel approval of the Atlantic Coast Pipeline).

In January 2021, the agencies re-issued essentially the same decisions approving the Pipeline. The Forest Service again (1) amended the Jefferson National Forest Plan to relax or waive eleven standards that the Pipeline would not be able to meet, and (2) concurred in BLM's issuance of a right-of-way and temporary use permit. Forest Service Record of Decision ("FS-ROD"), 1 [Vol1_Part1_005420]. BLM again issued that right-of-way and permit. BLM-ROD, 1 [Vol1_Part1_002462]. These new decisions fail to cure the flaws in the analysis of sedimentation, routes, and forest planning previously identified by this Court.

The agencies' consideration of sedimentation continues to fall short of legal requirements because it relies on modeling that does not reflect real-world conditions, including the limited effectiveness of mitigation in practice. *Sierra Club*, 897 F.3d at 595. Agency technical staff again raised concerns about the model, and called for consideration of real-world data, including the *hundreds* of Pipeline erosion control failures documented by West Virginia and Virginia regulators. But again, the agencies ultimately disregarded the concerns of technical

staff and the public, accepted the model, and approved the project without providing any additional information or analysis.

The agencies did no better on alternative routes or the forest planning rule, where they again ignored or misstated the applicable legal standards and reached conclusions not supported by the record.

Moreover, the agencies introduced new errors in an apparent last-minute attempt to expedite approval of the Pipeline. The Forest Service skipped its own predecisional review process at the request of project developer Mountain Valley Pipeline, LLC ("MVP"), in contravention of the plain language of the Forest Service's own regulations. The agencies did not consult with petitioner the Monacan Indian Nation, which was federally recognized after the prior decisions were finalized, and which was not previously consulted. And when MVP proposed to bore under streams—after failing to secure Clean Water Act permits required for in-stream construction—the agencies hastily approved such boring without any analysis of its impacts.

## II.  JURISDICTIONAL STATMENT

Under the Administrative Procedure Act and Natural Gas Act, this Court has original and exclusive jurisdiction over review of the Forest Service and BLM decisions regarding this interstate gas pipeline. *Sierra Club*, 897 F.3d at 589 (citing 5 U.S.C. §§ 701-06  and 15 U.S.C. § 717r(d)(1)). Petitioners' challenges were timely filed within a week of each agency's decision.

Petitioners Wild Virginia, Sierra Club, Appalachian Voices, The Wilderness Society, Preserve Craig, Save Monroe, and Indian Creek Watershed Association have standing because their members would have standing to sue in their own right. *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 262 (4th Cir. 2002). For example, Sierra Club member Maya Bohler regularly hikes in Jefferson National Forest to locations such as the Angel's Rest, Kelly's Knob, and Sugar Run, where the right-of-way is visible. Bohler Decl. ¶9; *accord* Bowers Decl. ¶¶15-16. Pipeline construction within the National Forest would injure these members by diminishing their enjoyment of these places. *Piney Run*, 268 F.3d at 263. Other groups' members will suffer

4

similar injuries. Sligh Decl. ¶¶6-9; Mann Decl. ¶¶9-12; Lewter Decl. ¶¶6, 9; Seriff Decl. ¶¶20-21; Henritz Decl. ¶¶15-16.

Petitioner Monacan Indian Nation ("the Monacans") has standing as a federally recognized American Indian tribe with ancestral ties to the area within the Jefferson National Forest. The U.S. Congress recognized the Monacan Indian Nation on January 29, 2018. Pub. L. No. 115-121 (2018). The Monacans have survived in the Piedmont area of Virginia and West Virginia on both sides of the Blue Ridge Mountains for thousands of years. *See* Compton Decl. ¶4.

The Monacans attach deep cultural significance to the lands included in the Pipeline right-of-way, as well as the natural resources affected by the Pipeline—especially waterways and surrounding areas. *Id.* ¶¶5-7. These irreplaceable resources are often the only opportunity for the Monacan people to connect with their ancestors in the places those ancestors carried out their daily lives. *Id.* ¶8. Pipeline construction will destroy these resources that the Monacan people are so connected to.

These injuries are traceable to the Forest Service and BLM decisions to approve the Pipeline. *Piney Run*, 268 F.3d at 263. If either

agency had not taken the challenged action, the Pipeline could not be built in Jefferson National Forest, and these injuries would not occur. An order vacating the approvals and mandating compliance with the agencies' substantive obligations would redress these injuries. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

## III. STATEMENT OF ISSUES

1. Did the Forest Service violate its own regulations by forgoing the administrative "predecisional review" process?

2. Was the agencies' failure to consult with the Monacans unlawful?

3. Did the agencies violate NEPA, NFMA, and the Mineral Leasing Act by failing to take a hard look at sediment and erosion impacts?

4. Did the agencies violate NEPA by approving the use of "conventional boring" to cross four waterbodies within the National Forest without providing any analysis of the impacts of such boring?

5.  Did the agencies violate NEPA, NFMA, and the Mineral Leasing
    Act by concluding that they lacked authority to evaluate off-forest
    pipeline routes, and by failing to provide such evaluation?

6.  Did BLM violate the Mineral Leasing Act by failing to
    demonstrate that alternatives that would increase collocation
    within the National Forest were impractical?

7.  Did the Forest Service violate its 2016 Amendment to the 2012
    Forest Planning Rule by failing to apply directly related
    substantive requirements of the 2012 Rule within the scope and
    scale of the Jefferson Forest Plan amendments?

## IV.  STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

#### 1. **National Forest Management Act and Forest Service Regulations**

NFMA requires the Forest Service to develop comprehensive
forest plans for each unit of the National Forest System. 16 U.S.C. §
1604(a). All activity in each national forest "shall be consistent with"
the applicable forest plan. *Id*. § 1604(i); 36 C.F.R. § 219.15. The

Jefferson National Forest Plan was adopted in 2004. Supplemental

Environmental Impact Statement ("SEIS"), 1 [Vol1_Part1_006051].

In 2012, the Forest Service rewrote its "Planning Rule" governing

forest plan development, replacing the 1982 rule. Final Rule, 77 Fed.

Reg. 21,162, 21,163, (Apr. 9, 2012) ("2012 Planning Rule"). The 2012

Planning Rule sets specific substantive requirements for forest plans

regarding ecosystem integrity; air, soil, and water quality; riparian

areas; plant and animal communities; timber; and "multiple uses." 36

C.F.R. §§ 219.8-219.11. It also requires the use of "best available

scientific information" and sets public participation and other

procedural requirements. *Id.* §§ 219.3-219.4, 219.16.

In 2016, the Forest Service clarified how the 2012 Planning Rule's

protections will be phased in across national forest system lands. *Sierra

Club*, 897 F.3d at 601. The Forest Service explained that, in light of the

changes created by the 2012 Planning Rule, "most" forest plans adopted

under the 1982 rule "will not be consistent with all the requirements of

the 2012 planning rule." Proposed Rule, 81 Fed. Reg. 70,373, 70,376

(Oct. 12, 2016). When the Forest Service undertakes a wholesale

revision of a forest plan, the revised plan must fully comply with the

2012 rule. 36 C.F.R. § 219.7. When the Forest Service amends a plan, the amended provisions must meet the "directly related" substantive requirements of the 2012 rule. *Id.* § 219.13(b)(5). A substantive requirement is "directly related" to an amendment based on the "purpose" *or* the "effects" of the amendment. *Id.* § 219.13(b)(5)(i).

Separate from the Planning Rule, Forest Service regulations require "predecisional administrative review" for "project-level" activities. 36 C.F.R. Part 218. Under this review, after completion of the NEPA process, the Forest Service must publish a draft record of decision, provide the public with at least thirty days to file objections thereto, and then substantively resolve all objections before issuing a final decision. 36 C.F.R. §§ 218.7(c)(2)(iv), 218.12. However, projects "proposed by the Secretary of Agriculture or the Under Secretary, Natural Resources and Environment" are not subject to this process. *Id.* § 218.13(b).

### 2. <u>Mineral Leasing Act</u>

Rights-of-way for gas pipelines across federal lands are governed by the Mineral Leasing Act, 30 U.S.C. § 185. The statute imposes numerous conditions on the issuance of rights-of-way. Agencies must

ensure—through regulations or permit conditions—that authorized

activities will not violate air, water quality, or facility siting standards,

such as applicable land management plans. 30 U.S.C. § 185(h)(2)(B). In

addition, "[i]n order to minimize adverse environmental impacts and

the proliferation of separate rights-of-way across Federal lands, the

utilization of rights-of-way in common shall be required to the extent

practical." *Id.* § 185(p).

Here, because the proposed pipeline crosses national forest as well

as a small parcel of land administered by the Army Corps of Engineers,

authority to issue the right-of-way lies with BLM, delegated from the

Department of the Interior. *Id.* § 185(c)(2). However, BLM will not

authorize a pipeline without the concurrence of the pertinent land

management agencies. 43 C.F.R. § 2884.26.

### 3. <u>National Environmental Policy Act</u>

NEPA requires that "[a]ll agencies of the federal government"

prepare a detailed environmental analysis for "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(C). That analysis, known as an Environmental Impact

Statement, ("EIS") must include "any adverse environmental effects

which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." *Id.*

Analysis of alternatives is the "heart" of the NEPA process. 40 C.F.R. § 1502.14 (2019).[1] Agencies must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.*

Where multiple agencies have authority over a project, they may cooperate in the production of a single EIS. 40 C.F.R. §§ 1501.5, 1501.6, 1506.3 (2019). For interstate gas pipelines, the Federal Energy Regulatory Commission ("FERC") leads this coordinated review. *Sierra Club*, 897 F.3d at 588. The Forest Service and BLM may adopt FERC's EIS, but only after independently ensuring that it satisfies the adopting agencies' NEPA obligations. *Id.* at 590.

Agencies may also adopt, tier to, or supplement an existing analysis. When "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the

---

[1] The agencies applied the NEPA regulations in effect prior to September 14, 2020. SEIS, i [Vol1_Part1_006035].

proposed action or its impacts," the agency "shall" consider this

information. 40 C.F.R. § 1502.9(c)(1)(ii) (2019). But the agency can do so

by "supplement[ing]" an existing EIS. *Id.*

### 4. <u>National Historic Preservation Act</u>

Section 106 of the National Historic Preservation Act ("NHPA"),

54 U.S.C. § 306108, "requires federal agencies to consider the effect of

their actions on certain historic or culturally significant sites and

properties (expressly including those of Indian tribes) and to seek ways

to mitigate those effects." *City of Tacoma v. FERC*, 460 F.3d 53, 69

(D.C. Cir. 2006). "[T]he NHPA, like NEPA, is a procedural statute

requiring government agencies to 'stop, look, and listen' before

proceeding." *Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1169

(9th Cir. 2016) (quotation omitted).

In carrying out those responsibilities, federal agencies must

"consult with any Indian tribe . . . that attaches religious and cultural

significance to" potentially affected properties. 54 U.S.C. § 302706(b).

This requirement applies to historic properties both on and off tribal

lands. 36 C.F.R. § 800.2(c)(2)(ii)(D).

Ordinarily, the Section 106 process must be completed before issuance of a federal permit, a process that usually concludes with a memorandum of agreement between the federal agency and consulting parties documenting ways the federal undertaking must avoid, minimize, or mitigate adverse effects. 36 C.F.R. §§ 800.1(c), 800.6(c). However, "[w]here alternatives under consideration consist of corridors or large land areas," the agency may instead "negotiate a programmatic agreement" to govern the identification of resources and resolution of adverse effects. *Id*. §§ 800.4(b)(2), 800.5(a)(3), 800.14(b). The agency must "identify and consult with" the appropriate tribes in developing a programmatic agreement, and must take their views into account "in reaching a final decision" on such an agreement. *Id.* § 800.14(f).

## B. Jefferson National Forest and the Forest Plan

The Jefferson National Forest spans the Appalachian Mountains of southwestern Virginia, slightly extending into West Virginia and Kentucky. Jefferson National Forest Land Resources Management Plan ("LRMP"), 1-6 [Vol1_Part1_047765]. The Pipeline crosses many places of special significance, including the Appalachian National Scenic Trail and the Brush Mountain Inventoried Roadless Area. EIS, 4-273–275

[FS-AR-0006020-0006022]. Topographically, the area consists of closely spaced ridges with deep intervening valleys. LRMP, 4-2, -7, -11 [Vol1_Part1_048029, 048034, 048038]. These steep slopes are known to be unstable. EIS, 4-66–69 [FS-AR-0005813-0005816]. This fact, coupled with the region's propensity for intense rainfall, causes the area to be susceptible to landslides and erosion. *Id.*

These resources are protected and managed pursuant to the Forest Plan for Jefferson National Forest, last revised in 2004. SEIS, 1 [Vol1_Part1_006051]. At the highest level, the Forest Plan articulates goals, such as Goal 4: "Manage soils to maintain or improve their productivity and to not contribute [harmful] sediment to streams." LRMP, 2-6 [Vol1_Part1_047773]. The Plan effectuates goals with management "prescriptions" delineating appropriate uses for specific areas. *Id.*, 1-6 [Vol1Part1_047765]. For example, prescription 6C, "Old Growth Forest Communities Associated with Disturbance," "emphasizes protection, restoration, and management of old growth forests and their associated wildlife, botanical, recreational, scientific, educational, cultural, and spiritual values." *Id.*, 3-81 [Vol1_Part1_047910]. Finally, the Forest Plan establishes "standards," which "set the sideboards for

achieving the goals, objectives and desired conditions." *Id.*, 1-1 [Vol1_Part1_047760].

Many standards apply throughout the forest. To protect soil and water quality, forest-wide standards limit activities that contribute to sedimentation and erosion, such as removal of vegetation and topsoil or activities that compact wet soils. *Id.*, 2-7 [Vol1_Part1_047774]. Other standards establish which activities are desired, permitted, or prohibited in specific locations. Standard FW-247 provides that linear rights-of-way must be placed in existing corridors "when feasible." *Id.*, 2-60 [Vol1_Part1_047827]. Standard 4A-028 allows new pipelines to cross the Appalachian National Scenic Trail, but *only* "where impacts major already exist," without exception. *Id.*, 3-23 [Vol1_Part1_047852]. Standard 6C-026 categorically prohibits designation of new utility corridors or rights-of-way in old-growth areas assigned to prescription 6C. *Id.*, 3-84 [Vol1_Part1_047913].

## C. Mountain Valley Pipeline

MVP proposes a 304-mile, 42-inch-diameter gas pipeline that will travel from Wetzel County, West Virginia to Pittsylvania County, Virginia. EIS, ES-2, 1-8 [FS-AR-0005505, 0005529]. Here, the issues

principally concern the 3.5 miles of approved route that cross the

Jefferson National Forest. SEIS, 3 [Vol1_Part1_006053] (map).

### 1. **Prior Litigation**

The Pipeline has a long procedural history, with numerous federal

approvals, many of which have been invalidated or withdrawn. In June

2017, FERC, as lead agency, issued a final EIS for the project, followed

by a FERC "certificate of convenience and necessity." SEIS, 1, 8

[Vol1_Part1_006051, 006058]. In December 2017, the Forest Service

and BLM issued their respective approvals. *Id.*, 1-2

[Vol1_Part1_006051-006052]. Those approvals were promptly

challenged. While that suit was pending, Pipeline construction

commenced, including tree felling and other activity within the

Jefferson National Forest, until it was halted in July 2018 by this

Court's decision in *Sierra Club*. *Id.*, 2 [Vol1_Part1_006052].

In *Sierra Club*, this Court vacated and remanded the Forest

Service and BLM approvals, holding that (1) the agencies had violated

NEPA by failing to take a hard look at the Pipeline's sedimentation

impacts; (2) the Forest Service violated its Planning Rule in amending

the Jefferson National Forest Plan; and (3) BLM violated the Mineral

Leasing Act by failing to consider whether the right-of-way had been co-
located with existing disturbance to the extent practical. 897 F.3d at
596, 603, 605. After *Sierra Club*, no construction has occurred within
the National Forest. SEIS, 2 [Vol1_Part1_006052].

The *Sierra Club* petitioners then sought an injunction prohibiting
MVP from constructing the Pipeline *outside* the National Forest
pending Forest Service and BLM decisions on remand. Case 17-2399,
Doc. 111-1 (Aug. 14, 2018). Petitioners argued that, under *Md.*
*Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir.
1986), construction outside the National Forest would improperly
influence or constrain the agencies' decisionmaking on remand. *Id.* at 4.
MVP opposed, arguing that any further construction undertaken by
MVP would be "at its peril," such that proceeding with construction
would not influence the agencies' decisionmaking. Case 17-2399, Doc.
113-1, at 14 (Aug. 17, 2018). This Court denied the request for an
injunction. Case 17-2399, Doc. 123 (Sept. 17, 2018).

Nonetheless, construction of the Pipeline outside the Forest has
been interrupted by suspension of multiple other permits. In October
2018, this Court held that the Army Corps of Engineers violated the

Clean Water Act in "verifying" the Pipeline under Nationwide Permit 12. *Sierra Club v. U.S. Army Corps of Eng'rs*, 905 F.3d 285 (4th Cir. 2018). The Corps attempted to re-approve the Pipeline in September 2020 under Nationwide Permit 12, but this Court stayed that decision shortly thereafter. *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251 (4th Cir. 2020). As such, the Pipeline has not constructed over 1,000 waterbody crossings along its route.[2] Lacking authorization for in-stream work, MVP has received authorization to instead bore *under* numerous waterbodies, including four streams within the Jefferson National Forest. SEIS, iv, 18 [Vol1_Part1_006038, 006068]

Meanwhile, significant upland construction, not involving waterbodies, occurred outside the Jefferson National Forest in the time between the start of construction and October 2019. Construction was fraught with problems. Virginia regulators identified more than 300 violations of erosion and sediment control requirements in 2018 alone.

---

[2] *See* https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20210329-5165, Table 2 (stream crossings); https://elibrary.ferc.gov/eLibrary/filedownload?fileid=15729309, Table 3 (wetland crossings). Petitioners request judicial notice of these and other documents cited herein available on federal websites. Fed. R. Evid. 201(b)(2), *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004).

[Vol1_Part1_015412]. In many incidents, Virginia investigators determined that unlawful sediment deposition reached waterbodies. *Paylor v. MVP*, Complaint, ¶¶ 44, 47-48, 51-52, 54, 58, 62 [Vol1_Part1_015356-015360]. In some cases, in-stream sediment was up to 11 inches deep, and extended up to 3,600 feet along stream channels. *Id.* ¶¶ 44, 48 [Vol1_Part1_015356-015357]. Similarly, West Virginia regulators issued 46 notices of violation of water protection requirements, [Vol1_Part1_015414-015555], including at least twenty-five in which sediment unlawfully entered a waterbody. [Vol1_Part1_017471-017473] (summary table).

All Pipeline construction was again halted in October 2019, after this Court stayed the Endangered Species Act "biological opinion" ("BiOp") for the Pipeline. *Wild Va. v. U.S. Dept. of Interior*, Case 19-1866, ECF No. 41 (4th Cir., Oct. 11, 2019). The Fish and Wildlife Service and FERC agreed to reinitiate consultation, and FERC issued an order prohibiting all Pipeline construction pending completion thereof. [Vol1_Part1_018739].

Construction outside the National Forest and waterbodies resumed in October 2020, after the Fish and Wildlife Service issued a

19

new BiOp. FERC, Order Partially Lifting Stop Work Order

[Vol1_Part1_018737-018759]. The new BiOp is under review in

*Appalachian Voices v. U.S. Dept. of Interior*, No. 20-2159 (4th Cir.).

## 2. Current Forest Service and BLM Decisions

This suit challenges the Forest Service and BLM approvals of the

Pipeline issued in January 2021. These decisions rely on FERC's 2017

EIS, together with a December 2020 Supplemental EIS ("SEIS") and

other documents prepared after the remand in *Sierra Club*. FS-ROD, 1

[Vol1_Part1_005420], BLM-ROD, 6 [Vol1_Part1_002467].

Both agencies rely on a pair of closely related "Hydrologic

Analys[e]s" provided by MVP in May 2020: the "Hydrologic Analysis of

Sedimentation for the Jefferson National Forest," (*hereinafter*,

"Hydrologic Analysis"), which models impacts along the 3.5 mile right-

of-way within the National Forest, and a parallel "Hydrologic Analysis

of Sedimentation for Streams near Suitable Habitat for Threatened and

Endangered Aquatic Species," which is not limited to federal lands and

which informed the 2020 BiOp. *See* BLM-ROD, 22 [Vol1_Part1_002483].

Both analyses use "the same methodology," *id.*, summarizing modeling

performed with soil loss equations developed by the U.S. Department of

Agriculture. Hydrologic Analysis, 18 [Vol1_Part1_026096]. These reports supersede the "Hydrologic Report" discussed in *Sierra Club*, 897 F.3d at 591-594, which used similar tools.

BLM prepared a "practicality analysis," which purports to address the practicality of alternative Pipeline routes, shortly after *Sierra Club*, and then supplemented this analysis shortly before publication of the draft SEIS. This analysis was included as Appendix A to the SEIS. [Vol1_Part1_006221-006245].

The Forest Service published the draft SEIS in September 2020. SEIS, 9 [Vol1_Part1_006059]. Hundreds of organizations and individuals, including Petitioners, submitted comments. The final SEIS was published on December 11, 2020. FS-ROD, 21 [Vol1_Part1_005440]. The Forest Service and BLM both adopted this SEIS, and issued their approvals on January 11 and 14, 2021, respectively. FS-ROD, 31 [Vol1_Part1_005450], BLM-ROD, 4 [Vol1_Part1_002465].

### 3. <u>The Approved Pipeline Project</u>

With the exception of water crossings, actual plans for construction of the Pipeline through the National Forest are largely

unchanged relative to the prior approvals summarized in *Sierra Club*, 897 F.3d at 587-88. Construction will require removing vegetation and grading a 125-foot-wide temporary right-of-way and workspaces. EIS, 2-23, -37 [FS-AR-0005592, FS-AR-0005606]. A trench at least 54 inches wide and 5.5 to 9 feet deep will then be dug. EIS, 2-38 [FS-AR-0005607]. The pipeline will be assembled, lowered into the trench, and buried. EIS, 2-39–40 [FS-AR-0005608-0005609].

Construction will increase erosion and sedimentation. Of the 83 acres that will be directly disturbed by pipeline construction within the Jefferson National Forest, 48.9 acres have soils with severe or very severe potential for erosion. EIS, ES-9, 4-82–83 [FS-AR-0005512, FS-AR-0005829-0005830]. Construction reduces the soil's resistance to erosion, increases the amount of water flowing over the soil, and creates ditches and ruts that channel water, all of which increase erosion. EIS, 4-73, 4-81 [FA-AR-0005820, FS-AR-0005828].

Erosion decreases soil productivity and harms water resources. LRMP EIS, 3-18, 3-157 [FS-AR-0163072, 0163211]. When water carrying suspended soil reaches a stream or other waterbody, it increases turbidity (essentially, opacity or cloudiness), impacting fish,

mussels, and other species that rely on clear water. *Id.*, 3-158 [FS-AR-0163212]. Further harm occurs when the sediment settles out of the water, as it covers the stream bottom, filling the spaces between rocks or other substrate and blocking access to food or shelter. *Id.* These impacts "all affect habitat quality and complexity." *Id.*

The approved permits require Mountain Valley Pipeline to take steps intended to reduce impacts from erosion. These include measures during construction, such as mulching and installing sediment barriers (such as silt fences) to contain sediment, and measures to restore conditions after construction, such as replacing topsoil and replanting disturbed areas. EIS, 4-81 [FS-AR-0005828]. Even if these measures are implemented perfectly, however, construction and operation of the pipeline will increase erosion and sedimentation. *E.g.,* Hydrologic Analysis, 4, 61 [Vol1_Part1_026082, 026139].

## V.  SUMMARY OF ARGUMENT

1.    The Forest Service violated its own regulations by skipping the predecisional review process. The exemption provided in the Forest Service regulations for actions "proposed" by the Under Secretary of

Agriculture, Natural Resources and Environment, does not apply here. Instead, the SEIS and FS-ROD consistently and correctly identify both the Pipeline and the Forest Plan Amendments as "proposed" by MVP. As such, the Forest Service decisions are subject to predecisional review.

2.     The agencies did not meaningfully consult with the Monacans regarding impacts to potential historic properties. The Monacans were federally recognized after, and not included in, FERC's NHPA process, and the Forest Service and BLM failed to meaningfully respond to the Monacans' subsequent requests.

3.     The agencies failed, once again, to properly analyze and disclose impacts from erosion and sedimentation. The agencies relied on modeling that uses unsupported assumptions about mitigation effectiveness. For example, despite the fact that three quarters of the slopes here have a grade steeper than 15%, the model leans on a source that expressly refused to estimate effectiveness on slopes that steep. At the same time, the agencies have failed to consider evidence of actual, real-world sediment impacts this Pipeline has already caused near the Forest, ignoring available USGS water quality data, and arbitrarily

disregarding state regulators' numerous findings of erosion control violations. These oversights are compounded by the agencies' failure to provide any analysis of whether predicted sediment increases would cause violations of state water quality standards.

4.    The agencies violated NEPA when they rubber-stamped a change in construction method for crossing waterbodies—substituting conventional boring for the originally-proposed in-stream open-trench methods—without providing any analysis of the impacts of this change.

5.    The agencies failed to examine alternative routes. In direct and unexplained contravention of *Cowpasture*'s command to examine routes that would avoid the National Forest, 911 F.3d at 168, the agencies mistakenly assert that they lack authority to conduct such evaluation. Although the agencies purport to address the possibility of increasing collocation with existing disturbance within the National Forest, *Sierra Club*, 897 F.3d at 605, they provide no specific facts demonstrating that more collocated alternatives are impractical.

6.    The Forest Service failed to apply the directly related "substantive requirements" of the 2012 Forest Planning Rule within the scope and scale of the Jefferson Forest Plan amendments. The Forest

Service's conclusion that the amendments would not "substantial[ly] lessen[] protections . . . across the JNF," FS-ROD, 25 [Vol1_Part1_005444], is factually unsupported, misstates the legal standard, and improperly relies on protection outside the scope and scale of the amendments.

# VI. ARGUMENT

## A. Standard of Review

This Court reviews the Forest Service's action under the Administrative Procedure Act's arbitrary and capricious standard. *Sierra Club*, 897 F.3d at 590-91. Agency decisions are arbitrary when an agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

When reviewing agency interpretations of statutes or regulations, courts begin with the plain language. Deference to agency interpretation "is not due unless a court, employing traditional tools of statutory construction, is left with an unresolved ambiguity." *Epic Sys.*

*Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (quotation omitted)

(statutory interpretation); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019)

(accord, for regulations). Only if the language is genuinely ambiguous

will courts defer to reasonable agency interpretations. *Mejia v. Sessions*,

866 F.3d 573, 583 (4th Cir. 2017); *Romero v. Barr*, 937 F.3d 282, 292-93

(4th Cir. 2019).

### B. The Forest Service's Decision to Skip Predecisional Review Is Unlawful Because the Pipeline Is Not "Proposed" by the Under Secretary

Project-specific forest plan amendments are subject to a

predecisional review process. 36 C.F.R. Part 218. The Forest Service

releases a draft record of decision, the public may object, and a final

decision cannot be made until all objections are resolved. *Id.* §§ 218.7,

218.12; FS-ROD-2017, 36 [FS-AR-0014898] (applying this process to the

2017 pipeline authorization). Forest Service rules exempt "[p]rojects

and activities *proposed by* . . . the Under Secretary, Natural Resources

and Environment" from this process. 36 C.F.R. § 218.13(b) (emphasis

added). The Forest Service's invocation of this exception here violates

the plain language of the regulation, because neither the Pipeline nor

the forest plan amendments were proposed by the Under Secretary.

27

Courts "must enforce the plain meaning" of regulations. *Kisor*, 139 S. Ct. at 2419. This entails using traditional tools, such as dictionaries, to determine whether language is unambiguous. *Id.*; *Romero*, 937 F.3d at 292-93 (using dictionaries to decide whether plain language ambiguous *before* looking to agency interpretation). The plain meaning of "propose" is "to put forward for consideration, discussion, or adoption." *The American Heritage Dictionary*;[3] *accord Meriam-Webster Dictionary Online* ("Propose: to set before the mind (as for discussion, imitation, or action)" or "to set forth for acceptance or rejection.").[4]

Under any of these definitions, MVP proposed the Pipeline and Amendments. Indeed, the only way MVP could receive authorization for a special use such as a pipeline is for *MVP* to "submit a proposal to the authorized officer." 36 C.F.R. § 251.50(a). The Forest Service repeatedly acknowledged that the "purpose and need for agency action is to *respond to a proposal from Mountain Valley*." FS_ROD, 9 [Vol1_Part1_005428] (emphasis added), *accord* SEIS, abstract, ii, 207

---

[3] https://www.ahdictionary.com/word/search.html?q=propose (last visited March 3, 2021).

[4] https://www.merriam-webster.com/dictionary/propose (last visited Mar. 3, 2021).

[Vol1_Part1_006033, 006036, 006257]. The Forest Service consistently describes the project as "Mountain Valley's proposal." FS_ROD, 9, 20 [Vol1_Part1_005428, 005439], *accord* SEIS, iii, 12, 42, 43, 135, 209, 222 [Vol1_Part1_006037, 006062, 006092, 006093, 006185, 006259, 006272]. MVP proposed both the Pipeline as a whole and, specifically, the amendments to the Jefferson National Forest Plan. SEIS, ii, 2. [Vol1_Part1_006036, 006052]. Indeed, it was even MVP that proposed circumventing the predecisional review period. Meeting Notes for April 10, 2020 [Vol1_Part1_026937], Interagency Call Notes for June 8, 2020 [Vol1_Part1_023377] (Forest Service "expects to include an objection process prior to making a decision.").

Neither the SEIS nor the Forest Service's ROD confront this plain language. Instead, the Forest Service's response to comments offers two flawed policy arguments for skipping predecisional review. SEIS, 221 [Vol1_Part1_006271]. First, the agency asserts that requiring predecisional review here would somehow intrude on the Secretary's role as the "responsible official" with authority to "*approve* a . . . plan amendment." 36 C.F.R. §§ 219.13, 219.62 (emphasis added). But "approve" is not synonymous with "propose." And applying the plain

language—to limit the exception to actions actually initiated by the Under Secretary—is the approach most consistent with the Forest Service's caution against "sweeping exceptions" to the review program. Proposed Rule, Project-Level Predecisional Administrative Review Process, 77 Fed. Reg. 47,337, 47,342 (Aug. 8, 2012); *accord* 2012 Planning Rule, 77 Fed. Reg. 21,162, 21,247-48 (Apr. 9, 2012) (explaining that similar exception codified at 36 C.F.R. § 219.51, applicable to non-project-specific forest plan amendments, will apply only in "rare occurrences"). If the Secretary or Under Secretary could invoke the administrative-review exception just by signing off on any project, the exception would swallow the rule.

Separately, the Forest Service argues that there would be no point to "subjecting Secretarial decisions to some sort of administrative review above or outside the Department." SEIS, 221 [Vol1_Part1_006271]. This misunderstands the purpose of predecisional review. Congress directed the Forest Service to adopt the predecisional review process to, in the Forest Service's words, "identify and correct any errors . . . before final decisions are made." 77 Fed. Reg. at 47,342 (citing CONSOLIDATED APPROPRIATIONS ACT, 2012, 125 Stat 786 § 428

(December 23, 2011)). This purpose is served by having more eyes on a proposal, and more process, and does not require *higher* authority. In 2018, this Court faulted the Forest Service for abandoning the concerns of agency technical staff through abrupt, unexplained "change[s] of course." *Cowpasture*, 911 F.3d at 158; *accord Sierra Club*, 897 F.3d at 596. This time, the Forest Service simply skipped steps that would have allowed the public and staff to raise those concerns in the first place.

Courts only defer to an agency's interpretation of its own regulation where the regulation "is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). Here, MVP "proposed" the Pipeline and Amendments within the plain meaning of the word, as the FS-ROD and SEIS state repeatedly. The section 218.13(b) exception therefore cannot apply. Circumventing predecisional review was unlawful.

## C. The Agencies Violated the NHPA by Failing to Consult with the Monacan Indian Nation

The Forest Service and BLM violated Section 106 of the NHPA by failing to meaningfully consult with petitioner Monacan Indian Nation. Under the NHPA, federal agencies must "consult with any Indian tribe . . . that attaches religious and cultural significance to" potentially affected properties. 54 U.S.C. § 302706(b). The Forest Service and BLM

31

agree that the Monacans are such a tribe, but the agencies err in concluding that the Monacans were adequately consulted here.

"Consultation," under the NHPA, "means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f). Any tribe that attaches religious or cultural significance to potentially affected cultural properties and that "requests in writing to be a consulting party shall be one." *Id.* § 800.3(f)(2). Agencies shall ensure the consultation process provides a tribe with "a reasonable opportunity to [1] identify its concerns about historic properties, [2] advise on the identification and evaluation of historic properties, . . . [3] articulate its views on the undertaking's effects on such properties, and [4] participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A). . These four requirements are further detailed in *id.* §§ 800.3-800.6. "Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes." 36 C.F.R. § 800.2.

1. **Monacans' Request for Consultation**

When FERC, the Forest Service, and BLM approved the Pipeline in 2017, the Monacans, which were not yet federally recognized, were neither consulted nor included in the 2017 NHPA programmatic agreement. *See* Programmatic Agreement, 5-6 [Vol1_Part1_000934-000935] (citing EIS, Table 4.10.5-1 [FS-AR-0006172-FS-AR-0006174]).

On February 28, 2019, after obtaining federal recognition, the Monacans sent a letter to the Forest Service, BLM, and FERC requesting consultation in all proceedings occurring as a result of the remand and vacatur in *Sierra Club*. [Vol1_Part1_031338]. They specifically requested "access to all treatment plans, cultural resource surveys, data recovery reports produced by archaeological consultants," and other information, as well as "government-to-government," "face-to-face consultation as soon as possible." [Vol1_Part1_031340-031342]; *see also* EIS, 4-468–469 [FS-AR-0006215-0006216] (summarizing cultural resource surveys conducted within the National Forest). They further requested that the December 2017 programmatic agreement be amended to include the Monacans as a consulting party. [Vol1_Part1_031342].

BLM replied, "Although at the present time all work has been paused, if and when work continues both USFS and BLM in conjunction with FERC will include the Monacan Nation in consultations." [Vol1_Part1_031211]. The Forest Service simply promised a further response. [Vol1_Part1_031140].

By November of 2019, however, the Monacans had not received any response beyond these short emails.[5] The Monacans therefore reiterated their request for consultation. [Vol1_Part1_027539-027540].

Meanwhile, the federal agencies acknowledged the Monacans' request for consultation in internal discussions, but declined to act on it. Notes for a June 5, 2020, federal interagency meeting observe that "The Monacan Tribe has expressed interest in consulting with [the Forest Service] on the MVP project," but state "[the Forest Service] *does not anticipate reinitiating formal Section 106 consultation* but will be contacting the Monacan Tribe." [Vol1_Part1_023382] (emphasis added).

---

[5] The SEIS states that the Forest Service sent a letter to the Monacans on June 24, 2019. SEIS, 261 [Vol1_Part1_006311]. The agencies' RODs, and the "Table of interactions/meetings with Monacan Indian Nation" prepared by the Forest Service, do not mention such a letter, nor does it appear in the record. [Vol1_Part1_002489, 005447, 007936]. Counsel for the Monacans is not aware of any such letter.

On July 8, 2020, the Forest Service offered to meet with the Monacans, but did not address the Monacans' requests for specific information, amendment of the programmatic agreement, or whether the Forest Service would "consult" with the Monacans within the meaning of Section 106. *Id.*[6]

The Forest Service then published the draft SEIS. The Monacans submitted comments again reiterating that they had not been consulted. SEIS, 267 [Vol1_Part1_006317].

Two days before the SEIS was finalized, the Forest Service still acknowledged in inter-agency meetings that it was "able to invite the Monacan Indian Nation to consult on the SEIS," and that the Monacans "ha[ve] requested to be part of FERC's Programmatic Agreement (PA), which FERC has declined to reopen," and the agency committed to "discuss internally how to move forward with the Monacan Indian Tribal consultation request." [Vol1_Part1_006366-006367]. Nothing in

---

[6] This letter stated that "[t]he proposed undertaking will have no effect upon historic properties or archaeological resources managed by the Forest Service." [Vol1_Part1_022558]. Both the EIS and SEIS identify at least one historic site within the area of potential effect in the National Forest for which mitigation is required. SEIS, 54 [Vol1_Part1_006104], EIS, 4-468–469 [FS-AR-0006215-0006216].

the meeting notes suggested that the Forest Service understood such consultation to have already occurred. Notwithstanding this acknowledgment, the agencies finalized the SEIS on December 4, 2020, and the Forest Service and BLM decisions were signed in January 2021.

### 2. <u>The Agencies' Actions Did Not Satisfy the NHPA</u>

Neither the Forest Service nor BLM offer a clear explanation as to how the agencies view the above facts as demonstrating compliance with the NHPA. FS-ROD, 27-28 [Vol1_Part1_005446-005447], BLM-ROD, 28 [Vol1_Part1_002489]. Regardless of the agencies' views, their actions clearly fell short.

As signatories to the Programmatic Agreement, both the Forest Service and BLM had authority to request adding the Monacans, but neither agency acknowledged this authority or justified failing to exercise it. Programmatic Agreement, 15 [Vol1_Part1_000944, 000951, 000953]. The agencies' failure to acknowledge or exercise their authority under the Programmatic Agreement in response to the Monacans' request was arbitrary. *See Mass. v. EPA*, 549 U.S. 497, 528-32 (2007) (remanding where agency had incorrectly concluded it lacked authority to act).

Nor did the agencies acknowledge the Monacans' requests for cultural resource surveys and other specific information, much less provide this information or explain their failure to do so. The Monacans requested access to this information in order to identify historic properties, 36 C.F.R. §§ 800.4(b), and evaluate their significance, *id.* § 800.4(c), both required elements of consultation. The Forest Service's "invit[ation]" to "bring questions or queries" regarding the SEIS to the agency did not provide the Monacans with a basis for this required participation. FS-ROD, 28 [Vol1_Part1_005447]. The invitation to comment "would be meaningless" without "access to available, relevant information." *Pueblo of Sandia v. United States*, 50 F.3d 856, 862 (10th Cir. 1995). In light of tribes' special status under the NHPA and tribes' unique concerns, "general requests" for information and public meetings will often be insufficient. *Id.* at 861; *accord Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1118 (S.D. Cal. 2010) (explaining that inviting Tribe to attend public informational meeting fell short of requirements in 36 C.F.R. § 800.2.(c)(2)(ii), especially where Tribe had repeatedly requested private face-to-face meetings).

While both agencies point to FERC's role in NHPA compliance, the Forest Service and BLM cannot pass the buck to FERC. *See Sierra Club*, 897 F.3d at 604 (FERC's authority over pipelines "does not limit or modify other agencies' authority or obligations."). Moreover, there is no FERC lead to follow: there is no FERC response to the Monacans' consultation request in the record or in the FERC docket, CP16-10, *contra* BLM-ROD, 28 [Vol1_Part1_002489].

More broadly, at the time the Monacans requested consultation, the Forest Service and BLM were deciding, after the remand in *Sierra Club*, whether to issue approvals for the Pipeline, an "undertaking" triggering NHPA obligations. 54 U.S.C. § 300320(3). FERC, in contrast, had already issued its final approval. *See Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1164 (9th Cir. 2018) (NHPA imposes only a limited "continuing obligation to evaluate previously approved projects."), *but see* [JA____] (Burau of Indian Affairs stating, in April 2019, that FERC must consult with the Monacans). Regardless of whether FERC could implicitly refuse to revisit its NHPA determination in light of the Monacans' federal recognition—a question not before this Court—the Forest Service and BLM were engaged in new approvals, and were

required to honor the Monacans' repeated requests for meaningful consultation prior to issuing those approvals.

## D. The Agencies Failed to Take a Hard Look at Sedimentation and Erosion

The SEIS again fails to take a hard look at the environmental impact of construction-related erosion and soil loss along the Pipeline route, which delivers harmful sediment to nearby waterbodies. The agencies' conclusions on sediment, erosion, and aquatic impacts again rest on unsupported modeling. At the same time, the agencies ignore real-world data regarding the Pipeline's impacts in terrain adjacent to the Jefferson National Forest—data which demonstrates that the SEIS's conclusions are unreasonable. And the SEIS fails to explain how even its optimistic erosion and sedimentation estimates would impact environmental resources, or whether predicted impacts would comply with applicable state water quality standards. Failure to take a hard look at sediment issues violates NEPA and precludes the Forest Service and BLM from making determinations required by the Forest Planning Rule and Mineral Leasing Act.

1. **The Sediment Modeling Relies on Unsupported and Implausible Assumptions**

The SEIS, like the flawed 2017 analyses, relies on modeling performed by an MVP contractor to estimate how Pipeline construction will increase erosion and sedimentation. SEIS, 49-50 [Vol1_Part1_006099-006100]. One input to the 2017 and 2020 modeling—the "practice" or "management" factor—estimates mitigation effectiveness, *i.e.*, the amount by which "best management practices" such as silt fences reduce the amount of sediment that would otherwise reach streams. Hydrologic Analysis, 39-43 [AR026117-026121]. In 2017, the Forest Service ultimately assumed overall mitigation effectiveness of 79%, whereas Forest Service technical staff had stated that 48% would be the highest possible acceptable value, and that effectiveness as low as 10% had been seen in practice. [FS_AR_0109478]. *Sierra Club* held that reliance on the 79% value was unjustified. 897 F.3d at 595.

Now, the SEIS and updated modeling report: (1) fail to disclose the mitigation effectiveness value or values actually used; (2) fail to support the mitigation values the model appears to use; and (3) fail to justify the model's assumption that imperfect implementation will only

reduce mitigation effectiveness in some circumstances, and even there by only 10%.

On the first issue, the SEIS and hydrologic analysis fail to disclose the effectiveness attributed to individual mitigation measures. The Analysis assumes that combining multiple mitigation measures will reduce sediment "from 45% to 70%" for perpendicular (up the slope) profiles and by "approximately 83%" for transverse (across the slope) profiles. SEIS, 84 [Vol1_Part1_006134]; *see* [Vol1_Part1_025956-025957] (diagrams illustrating these profiles). But the analysis does not identify the effectiveness attributed to individual measures, and without this, decisionmakers and the public cannot evaluate the soundness of the estimate of aggregate effectiveness.

For perpendicular profiles, mitigation will include "water bars and diversion ditches that route sediment-laden water to sediment traps on the downslope side of the alignment." Hydrologic Analysis, 42 [Vol1_Part1_026120]. The Analysis provides *no* information about effectiveness of these measures taken individually, despite Forest Service staff having specifically requested this type of information for perpendicular profiles. [Vol1_Part1_023174-023175].

For transverse profiles, the Analysis provides incomplete, ambiguous, and contradictory information. The overall 83% estimate purportedly reflects combining a "porous barrier" that intercepts runoff and blocks sediment, such as a silt fence, with a "cover" practice to reduce the erodibility of disturbed soil. Hydrologic Analysis, 42-43 [Vol1_Part1_026120-026121]. The Analysis states that porous barriers will reduce sediment by "*on the order of* 50%" or "*about* 50%," without specifying the actual values used in the model or explaining why no specific value was provided. *Id.*, 40, 43 [Vol1_Part1_026118, 026121] (emphases added). More importantly, in the Analysis's appendix that illustrates how the model was actually applied, silt fences are stated to be "63% to 87%" effective. *Id.* Appendix A.16 [Vol1_Part1_025963]. The Analysis does not explain this discrepancy.

Failing to disclose the actual mitigation effectiveness estimate(s) violates NEPA's requirement for "clarity and transparency," *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012), especially because the estimate has "ramifications for the entire project analysis." *Sierra Club*, 897 F.3d at 595. Forest Service staff criticized a June 2019 draft of the Hydrologic Analysis for failing to do

"an adequate job [of] stating or defending how these high effectiveness rates [for mitigation measures] were developed." [Vol1_Part1_023124, 023183]. Despite this, no further explanation was provided in the final Analysis.

Second, insofar as the Analysis discloses individual values, the Analysis does not support using these values in the National Forest. The only study cited in support of the "about 50%" value is "Galetovic 1998." Hydrologic Analysis, 40 [Vol1_Part1_026118]. This study noted that silt fence effectiveness decreased as slope increased, and expressly refused to provide estimates for slopes over 15% because "there is much uncertainty concerning the effectiveness of these barriers on steep hillslopes." Galetovic 1998, 6-15 [JA____]. The citation offered for the Hydrologic Analysis Appendix's assertion that silt fences are "63% to 87%" effective is a study that only considered slopes of 4.5% or less, on gas well sites in Texas. [AR025963], Wachal and Banks 2009, 1618 [JA____]. Within Jefferson National Forest, however, three quarters of the Pipeline route Forest crosses slopes exceeding 15%. EIS, 4-67 [FS-AR-0005814]. More than half crosses slopes exceeding 30%. *Id.* And

43

many slopes crossed exceed 40%, or even 50%. EIS, K2-18–K2-20 [FS-AR-0007417-0007419].

As part of the federal interagency review of the Hydrologic Analyses, Fish and Wildlife Service staff asked for evidence of mitigation effectiveness on slopes exceeding 15%, but MVP refused to provide any. [Vol1_Part1_023148]. The agencies have not explained why or how they determined that such evidence was unnecessary. Either the agencies arbitrarily "ignored" the impact of slope on mitigation effectiveness, or they "failed to provide a reasoned explanation based on the evidence before" them. *Ohio River Valley Envtl. Coal. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006).

Third, the agencies do not support their optimistic assumption that imperfect implementation of mitigation measures will reduce mitigation effectiveness only slightly. The agencies implausibly assume that "human errors" will not have any impact on mitigation effectiveness for perpendicular (up slope) profiles, and that such errors will only cause a "10% increase in soil loss" for transverse (cross slope) profiles. Hydrologic Analysis, 42 [Vol1_Part1_026120]. This optimism cannot be reconciled with the record.

The implicit conclusion mitigation measures will always work exactly as intended on perpendicular profiles is unsupported and implausible. MVP has a well-documented history of improperly installing or maintaining the measures used on perpendicular profiles. *E.g.*, [Vol1_Part1_015357, 015415, 015432, 015451] (water bars), [Vol1_Part1_015526, Vol1_Part2_002949, 003173, 010527-010528] (sediment traps). The Hydrologic Analysis and SEIS entirely fail to explain why *no* adjustment for failure, improper installation, or insufficient maintenance was made for mitigation on perpendicular profiles.

Nor is the agencies' conclusion that imperfect implementation will only reduce mitigation effectiveness on transverse profiles by 10% supported or credible. The 83% effectiveness estimate for transverse profiles purportedly reflects performance when runoff passes through silt fences. *See* Hydrologic Analysis, A.16 [Vol1_Part1_025963]. But as the Forest Service explained in comments on FERC's draft EIS, "*even when properly installed and maintained*," such measures have "limited success." [FS-AR-0064890] (emphasis added). Silt fences installed in controlled conditions for purposes of scientific testing routinely allow

water to pass under or around the barrier. Science Policy Initiative Comment, 5-6 [Vol1_Part1_017166-017167] (expert comments summarizing published literature). Moreover, Forest Service staff recognized that "in the field," mitigation measures frequently *are not* "proper[ly] install[ed]," and that this "is widely understood in the industry to be a limiting factor." [FS-AR-0109478]. Evidence in the record—including Forest Service staff's own comments—strongly indicates that an overall estimate of 83% effectiveness, reduced by 10% to account for human error, for an overall estimate of 74.7%, is unreasonable and unsupported. *See Sierra Club*, 897 F.3d at 596 (stating that 79% mitigation effectiveness estimate was "counter to the evidence before the agency").

In summary, the overall estimates of mitigation effectiveness that the agencies adopted this round are not significantly different from or better supported than the estimate this Court rejected as unsupported in *Sierra Club*. The agencies have not provided information that would enable the public or decisionmakers to scrutinize these estimates, the studies the agencies cite don't support the conclusions the agencies reach here, and the agencies again accept an unexplained assumption

about how well measures will be implemented in practice. The

Hydrologic Analysis falls short of the hard look NEPA requires, and

cannot support the agencies' substantive evaluations under the

National Forest Management Act and Mineral Leasing Act.

### 2. **Evidence of the Pipeline's Actual Impacts Indicates that the Model Is Unreasonable, but the Agencies Failed to Address this Evidence**

The agencies further violated NEPA, the Mineral Leasing Act,

Forest Service regulations by ignoring evidence of the actual, real-world

impacts of Pipeline construction. As Forest Service staff and numerous

commenters explained, impacts of MVP's past work outside the

National Forest foretell consequences of future construction within the

Forest. By refusing to consider this evidence, which directly

undermined the agencies' conclusions, the agencies failed to consider an

important part of the problem and violated NEPA's requirement to

ensure the "scientific integrity" of the data used. 40 C.F.R. § 1502.24

(2019). *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973-74

(9th Cir. 2002) (Forest Service violated NEPA by using methodology

directly undermined by "hard scientific information in [its] possession").

The Forest Service further violated its obligation to use the "best

available scientific information" in amending forest plans. 36 C.F.R.

§ 219.3.

One important source of real-world data that the agencies ignored

is data from water quality monitors operated by the United States

Geological Survey ("USGS") in waterbodies impacted by existing

Pipeline construction. As comments on the draft SEIS explained, these

monitors indicated that Pipeline construction impacted water quality

much more severely than predicted by MVP's modeling.

[Vol1_Part1_015299-015300, 017169-017171]. For example, the Pipeline

route crosses the Roanoke River fifteen miles outside the National

Forest. EIS, 4-27, B-34 (map) [FS-AR-0005774, 0006531]. The USGS

maintains water quality monitors upstream and downstream of this

crossing. Science Policy Initiative Comment, 9 [Vol1_Part1_017170].[7]

From May 1 to August 19, 2018, Pipeline construction took place in the

upland areas draining into both sides of this crossing. *Id.*, 10

---

[7] The USGS pages for these monitors, including maps, are
https://waterdata.usgs.gov/monitoring-
location/0205450393/#parameterCode=00300 (upstream) and
https://waterdata.usgs.gov/monitoring-
location/0205450495/#parameterCode=00300 (downstream).

[Vol1_Part1_017171].[8] Before Pipeline construction, these two USGS gauges reported closely matched values for turbidity, a value that correlates with the amount of sediment in the water—as would be expected for gauges roughly 300 meters apart. *Id.* During construction, however, turbidity values at the gauge downstream of Pipeline construction were approximately 20% higher than at the gauge upstream of construction, indicating that Pipeline construction caused significant additional sediment to be deposited in the river. *Id.*

This 20% increase in sediment documented by the USGS monitors is massively higher than the 2.1% increase predicted for the Roanoke River by the Hydrologic Analysis for Threatened and Endangered Species. *Id.* (citing [Vol1_Part1_026418]). The analysis for threatened and endangered species "us[ed] the same methodology" and assumptions as the Hydrologic Analysis for the Jefferson National Forest. BLM-ROD, 22 [Vol1_Part1_002483]. The fact that this methodology appears, in this case, to understate sediment delivery by an order of magnitude calls that methodology into question.

---

[8] The river crossing itself has not yet been constructed. [Vol1_Part1_000979-000980].

49

Comments on the draft SEIS directly cited the USGS data and asked the agencies to use this data both to evaluate project impacts directly and to test the validity of the Hydrologic Analysis. [Vol1_Part1_015299-015300, 017169-017171]. The agencies dismissed these recommendations by erroneously asserting that commenters who argued for use of "actual on-the-ground data" had "not provided the Forest Service with specific data that the SEIS has not reviewed or analyzed," entirely ignoring the USGS data. SEIS, 219 [Vol1_Part1_006269]. Nothing in the SEIS even acknowledges—much less demonstrates review or analysis of—the USGS data. The agencies have thus not provided any basis to dispute the data or methodology used by the commenters to question the Hydrologic Analysis's validity, given the contrast between the real world 20% increase and the model's predicted 2% increase. Nor do the agencies dispute that similar analyses, using other USGS monitors, could be performed for other streams already impacted by Pipeline construction.

The agencies also arbitrarily brushed aside state regulators' findings of hundreds of instances of erosion control failure or unlawful delivery of sediment to waterbodies. *Supra* pages 18-19. This data

should have led the agencies to question the model's assumptions, including the model's assumption that imperfect implementation would only degrade effectiveness on transverse profiles, and there only by 10%. Instead, the SEIS offers two flawed arguments for disregarding this evidence. First, the SEIS cites geography, arguing that "no citations were issued because of non-compliance on [National Forest] lands." SEIS, 228 [Vol1_Part1_006278]. But the issue here is whether the agencies adequately considered evidence—documented violations from construction of other portions of this Pipeline—that refuted the model's predictions of minimal impacts within *and outside* the Forest. Nor does the SEIS explain why erosion in the National Forest would differ from erosion outside it.

Second, the SEIS cites chronology, asserting that past violations are irrelevant because "further requirements" were imposed after West Virginia and Virginia regulators cited MVP. *Id*. This apparently refers to the consent decree between Virginia and MVP announced in October 2019. [Vol1_Part1_012251-012273].[9] Again, the assertion is irrelevant

---

[9] The SEIS refers to "an MOU," implied to be between MVP and VDEQ, that required "enhanced [erosion control devices]" and other "additional mitigations." SEIS, 228 [Vol1_Part1_006278]. The SEIS

to the question of whether violations demonstrate invalidity of the model. The Hydrologic Analyses are based on the practices approved in 2017, and explicitly do not address "enhanced [best management practices]" adopted after 2018. SEIS, 85 [Vol1_Part1_006135]. The models also purport to predict the impact of all Pipeline construction, including construction that has already occurred. Comparing the model's predictions of what would result from past practices with the real-world results of those practices is therefore an apples-to-apples comparison that tests the model's validity. Moreover, erosion and sediment violations have continued to occur despite any "further requirements." *See, e.g.,* [Vol1_Part1_018130] (summarizing June 2020 enforcement), [Vol1_Part2_000903] (May 4, 2020 report that slip "overtopped the silt fence and allowed material to enter stream."), [Vol1_Part1_012577-012579] (November 7, 2019 notice of violation for sediment in streambed). And finally, any decrease in the frequency of violations after October 2019 is likely due to the fact that *all* pipeline construction was halted at this time. *See supra* page 19.

---

does not cite, and Petitioners are not aware of, such a memorandum. The Virginia consent decree requires additional inspections but no additional control devices.

Commenters were not alone in arguing that the Hydrologic Analysis should be reconciled with real-world data. Forest Service staff, in comments to MVP, explained that the Analysis was "based on modeling, when there is a wealth of actual monitoring taking place over the last two years," including Virginia regulators' reports, data which is "important" to address. [Vol1_Part1_023169-023170]. A Natural Resource Conservation Service reviewer noted that MVP had not provided information needed to "compar[e] the [actual] effectiveness of the planned [mitigation measures] and the parameters in [the model] for the same [measures]." [Vol1_Part1_023188]. More generally, a Forest Service guidance document explains "It is not clear which model works best for a particular site without comparing results against measured data." Forest Service, Erosion Control Treatment Selection Guide, 32 (Dec. 2006).[10]

The agencies' ultimate refusal to evaluate whether the model comported with observed impacts of Pipeline construction constitutes a failure to consider an important aspect of the problem. *Sierra Club*, 897 F.3d at 591, *Idaho Sporting Cong.*, 305 F.3d at 973-74. Moreover, the

---

[10] https://www.fs.fed.us/t-d/pubs/pdf/hi_res/06771203hi.pdf.

Forest Service violated its requirement to "identify" and "use the best available scientific information," *i.e.*, the information that "is the most accurate, reliable, and relevant to the issues being considered." 36 C.F.R. § 219.3. The agencies' refusal to consider information about actual Pipeline construction when predicting future sediment and erosion impacts was arbitrary.

3.  **The Agencies Failed to Address Whether Erosion and Sedimentation Would Violate Water Quality Standards, in Violation of NEPA, the Mineral Leasing Act, and the Forest Planning Rule**

It is not enough to estimate how much soil will be lost to erosion or how much sediment will be deposited in rivers: the agencies must take a hard look at the impact of these deposits. This additional analysis is not only required by NEPA, *see* 40 C.F.R. § 1508.8 (2019) (requiring discussion of, *e.g.*, "ecological" effects), but also by the agencies' substantive obligations. The Mineral Leasing Act prohibits BLM from granting a right-of-way unless it is satisfied that the pipeline developer has "the technical and financial capability to construct, operate, maintain, and terminate the project . . . in accordance with[,]" *inter alia*, applicable water quality standards. 30 U.S.C. §§ 185(h)(2)(B), (j) . The Forest Service must conduct a searching review of impacts to

aquatic resources, habitat, and species as part of its Planning Rule process. *Infra* Part VI.G.

The RODs and SEIS violate these obligations by entirely failing to acknowledge Virginia's water quality standards and the agencies' duty to demonstrate consistency therewith. The SEIS failed to respond to multiple comments on this issue. *E.g.,* [Vol1_Part1_015305, 015915, 018130].

Virginia's water quality standards protect streams by prohibiting pollution in amounts that are "inimical or harmful to human, animal, plant, or aquatic life," or that would "interfere . . . with designated uses of such water." 9 Va. Admin. Code § 25-260-20(A). Among the ways the water quality standards protect aquatic life is by requiring the control of pollutants—like sediment—that cause turbidity or deposits on the streambed. *Id.* Virginia's water quality standards further broadly limit "degradation" of any waterway. *Id.* § 25-260-30(A). Those narrative water quality standards are just as enforceable and important as numeric water quality criteria. *See, e.g.*, *PUD No. 1 of Jefferson Cty. v. Wash. Dept. of Ecology*, 511 U.S. 700, 716 (1994); *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 144 (4th Cir. 2017).

Nothing in the SEIS or RODs addresses whether, even if the Hydrologic Analysis's predictions are correct, construction and operation of the Pipeline will cause violations of these in-stream water quality standards. The Hydrologic Analysis did not make predictions about turbidity or total suspended solids—the parameters of concern for a water quality standards analysis. SEIS, 83 [Vol1_Part1_006133]. The SEIS acknowledged that it may be possible to predict turbidity and suspended solids, but the agencies concluded that doing so was unnecessary. *Id.,* 83-84 [Vol1_Part1_006133-006134].

The Hydrologic Analysis suggests that violations of water quality standards are in fact likely to occur. It predicts that "[s]eventeen percent of the affected stream miles are estimated to experience temporary sedimentation greater than 10%" over baseline, with several stream reaches experiencing increases of more than twenty percent, or even thirty percent. Hydrologic Analysis, 4, 61 [Vol1_Part1_026082, 026139]. The agencies offer no explanation as to how these predicted increases would comport with water quality standards.

The agencies were also obligated to consider other evidence demonstrating that violations of water quality standards are likely. As

the SEIS recognizes, widespread "violations of state water quality standards [have been] reported and documented along the entire proposed pipeline route." SEIS, 228, 238 [Vol1_Part1_006278, 006288]. These included discharges of sediment accumulating up to eleven inches deep, or extending up to 3,600 feet along stream channels. *Paylor v. MVP*, Complaint ¶¶ 44, 48 [Vol1_Part1_015356-015357]. The agencies' arguments for disregarding these violations founder, as discussed *supra* pages 50-53.

The SEIS's only detailed discussion of sedimentation *effects* concerns impacts on threatened, endangered, and sensitive species. SEIS, 89-99 [Vol1_Part1_006139-006149]. This cannot substitute for discussion of water quality standards. Virginia's standards protect aquatic life generally, not just species in these categories. For example, one way that compliance with these standards is assessed is by "monitoring benthic macroinvertebrates"—aquatic invertebrates large enough to be seen with the naked eye. *S. Appalachian Mountain Stewards v. Red River Coal Co., Inc.*, 420 F.Supp.3d 481, 489 (W.D. Va. 2019). Virginia assesses the presence and diversity of 111 different families of benthic macroinvertebrates to determine whether the

biological components of its water quality standards are being met. Tetra Tech, *A Stream Condition Index for Virginia Non-Coastal Streams*, App. C (2003).[11] The list of threatened, endangered, and sensitive species discussed in the SEIS only includes representatives of two of these families: dragonflies (Family Gomphidae) and mussels (Family Unionidae). SEIS, 111-114 [Vol1_Part1_006161-006164]. Thus, where the SEIS concludes that sediment in a particular waterway will not adversely impact special-status species because no such species are present, *e.g.,* SEIS, 97-99 [Vol1_Part1_006147-006149], this says little or nothing about whether the sediment will impact other species that *are* present, and thus whether sediment will violate Virginia's narrative water quality standards. Similarly, where the SEIS concludes that because a species is abundant elsewhere, the *species* can withstand impacts to one waterway, *e.g.* SEIS, 98 [Vol1_Part1_006148] (discussing Green-faced clubtail), this does not show that *that waterway* will continue to meet Virginia's water quality standards.

---

[11] *Available at* https://www.deq.virginia.gov/home/showdocument?id=4317.

Nor can the agencies implicitly rely on the Virginia Department of Environmental Quality's 2017 certification that the Pipeline would not cause violations of water quality standards, because that certification was based on analyses superseded by the SEIS. *See Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 397-99 (4th Cir. 2018) (discussing Virginia's certification under Clean Water Act section 401, including reliance on FERC's 2017 analysis). The agencies and this Court have repudiated the old hydrologic report incorporated into FERC's 2017 EIS, and the current Hydrologic Analysis predicts that Pipeline construction will increase sediment delivery, as percentage above baseline, by more than twice the amount predicted in 2017. *See* Hydrologic Analysis Appendix B.15 [Vol1_Part1_025983] (comparing 2020 and 2017 analyses). Accordingly, the 2017 Virginia water quality certification provides no support for the proposition that the sediment delivery the agencies currently expect will not violate Virginia's water quality standards.

### E. The Agencies Failed to Take A Hard Look at Stream Crossings

The Pipeline will cross four streams within the National Forest. SEIS, 77 [Vol1_Part1_006127] (map). As approved, MVP will cross these streams using a "conventional bore," wherein the Pipeline passes under the stream. BLM-ROD, 22 [Vol1_Part1_002483]; *see also* BiOp, 25 [Vol1_Part1_000981] (summarizing conventional bore process). This is a change relative to the plan considered in the 2017 EIS, which entailed "dry-ditch open cut" stream crossings. EIS, 2-43–44, 4-220 [FS-AR-0005612-0005613, 0005967] (summarizing these processes). The agencies violated NEPA by failing to take a hard look at this change, and by failing to rigorously explore the benefits and drawbacks of choosing boring instead of the previously approved dry-ditch methods. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292-93 (1st Cir. 1996). Without this analysis, the agencies could not make an informed choice about the appropriate crossing method, and the agencies simply abdicated their obligations under the Mineral Leasing Act by assigning the choice to MVP. 43 C.F.R. § 2881.2(a)-(b)

The SEIS incorrectly asserts that the EIS already analyzed the impacts of conventional boring under waterbodies. SEIS, 58

[Vol1_Part1_006108] (citing EIS 4-139 and 4-220–223 [FS-AR-0005886, 0005967-0005970]). None of the EIS pages cited by the SEIS discuss conventional boring. Indeed, the only times the EIS discusses conventional boring under waterbodies, it is to assert that "it is not feasible or practicable to use trenchless methods (conventional bore, [horizontal directional drill], and direct pipe) at every water body." EIS Appendix AA IND112-1 [FS-AR-0009614]. Stated otherwise, because conventional boring was not planned for any stream crossing at the time of the EIS, nothing in the EIS addresses the environmental impact of conventional boring under waterbodies.

If the agencies had addressed the issue, they would have seen that switching from open-cut crossings to conventional boring entails both environmental benefits and environmental harms. The SEIS notes that boring will "reduce . . . effects to sensitive aquatic environments and species," SEIS, 96 [Vol1_Part1_006146], but the SEIS does not discuss the scale of the reduction or the residual aquatic impact. Although the goal of boring is to avoid in-stream disturbance, boring can impact streams in multiple ways. The borehole can collapse, leading to stream dewatering. [Vol1_Part1_014492] (quoting FERC's draft EIS for MVP

Southgate). Soil excavated from the bore pit or borehole can be improperly stored and wash into the stream. *Id.*, *accord* [Vol1_Part1_015479] (notice of violation stating that improperly maintained bore pit was impacting stream).

Moreover, even where conventional boring reduces water impacts, it increases other impacts. Dewatering bore pits can require pumps operating twenty-four hours a day, for days or weeks. SEIS, 79 [Vol1_Part1_006129], EIS 2-55 [FS-AR-0005624]. These pumps generate significant noise. *E.g.,* EIS 4-539 [FS-AR-0006286] (discussing noise from horizontal directional drilling). The SEIS provides no discussion of whether this noise will impact wildlife, or the effectiveness and appropriateness of mitigation measures.

FERC, for its part, agrees that boring under streams was not considered in the EIS. Days before issuance of the decisions challenged here, FERC staff issued a draft Environmental Assessment addressing the Pipeline's proposed use of conventional boring outside the National Forest. FERC, Environmental Assessment for MVP Project Amendment

(Jan. 7, 2021).[12] FERC admitted that conventional boring under streams "was not considered in" the 2017 EIS. *Id.* at 6. FERC further concluded that because of the potential for boring noise to impact bats, consultation with the Fish and Wildlife Service was required. *Id.* at 27.[13]

Because conventional boring will impact the environment "in a significant manner . . . not already considered," the agencies must take a hard look at these impacts. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). Rather than generally stating that boring reduces impacts, the agencies must rigorously explore the qualitatively different effects of the changed crossing methodology, to inform their decision whether boring or dry-cut crossing is in fact more appropriate at the particular places at issue here; *e.g.*, whether boring will reduce stream impacts but increase wildlife or other impacts, and whether this trade is

---

[12] Available at https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20210107-3064.

[13] This draft environmental assessment was never finalized, because MVP withdrew the underlying request on January 26, 2021. *See* https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20210219-3042. On March 16, 2021, FERC announced NEPA scoping for MVP's superseding application. https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20210316-3075.

worthwhile. *See, e.g.,* Virginia Comment on Draft SEIS [Vol1_Part1_017962] (requesting testing to "determine whether or not conditions at proposed crossings [in the national forest] are suitable for boring beneath streams"). As the First Circuit has observed, "[i]t would be one thing if the Forest Service had adopted a new alternative that was actually within the range of previously considered alternatives, *e.g.*, simply reducing the scale of every relevant particular. It is quite another thing to adopt a proposal that is configured differently." *Dubois*, 102 F.3d at 1292-93. In the latter case, the Forest Service must seriously consider "wholly new problems posed by the new configuration (even if some of the environmental problems present in the prior alternatives have been eliminated)." *Id.* at 1293.

Here, the agencies failed to compare stream crossing alternatives, or to provide a clear basis for the choice between them. 40 C.F.R. § 1502.14 (2019). MVP proposed conventional boring under waterbodies only after the Clean Water Act permits necessary for open-cut crossings were vacated. [Vol1_Part1_022573]. The Forest Service and BLM's obligation is to approve the method that best "protects . . . natural resources" and "prevents unnecessary or undue degradation to public

lands," not the method that imposes the least regulatory burden on

MVP. 43 C.F.R. § 2881.2(a)-(b). Here, the final decisions approve

conventional boring not based on any reasoned explanation provided by

the agencies, but simply because this is what MVP wanted.

Conventional boring may, upon examination, prove to be the less

environmentally damaging alternative. But NEPA serves to ensure

informed, considered decisions, and the agencies have not demonstrated

such consideration here. *See, e.g.*, *Dubois*, 102 F.3d at 1292-93.

## F. The Agencies Failed to Consider All Reasonable Alternatives or to Justify Rejecting Alternative Routes

The National Forest Management Act, the Mineral Leasing Act,

and the statutes' implementing regulations impose substantive

requirements to consider *and adopt* alternative routes that reduce or

eliminate creation of new rights-of-way within the National Forest,

whether by relocating the Pipeline off the forest entirely, or by co-

locating with existing disturbance in the Forest. *Cowpasture*, 911 F.3d

at 168, *Sierra Club*, 897 F.3d at 605. NEPA similarly requires a

rigorous exploration of all feasible alternatives. *Cowpasture,* 911 F.3d at

170-73. Here, the agencies failed both to consider reasonable

alternatives and to justify rejecting certain alternatives.

1. **The SEIS Fails to Meaningfully Consider Off-Forest Route Alternatives**

The SEIS fails to examine off-forest routes, as required by NEPA, the Jefferson National Forest Plan, and the Forest Service and BLM regulations concerning special uses and rights-of-way. The agencies' claim that they lack authority to undertake this analysis fails.

Forest Service and BLM regulations prohibit approval of the project unless it is in the "public interest." 36 C.F.R. § 251.54(e)(5)(ii); 43 C.F.R. § 2884.23(a). The Forest Service has interpreted this requirement to prohibit uses of the national forest that could "reasonably be accommodated off of National Forest System lands." *Cowpasture*, 911 F.3d at 168 (quoting Forest Serv. Manual 2703.2) (holding that the Forest Service acted unlawfully by failing to demonstrate that off-forest accommodation would be unreasonable). For the Jefferson National Forest in particular, Standard FW-244 states that special use authorizations must be "limit[ed] to needs that cannot be reasonably met on non-NFS lands or that enhance programs and activities." SEIS, 31 [Vol1_Part1_006081]. Off-forest routes must also be explored as part of NEPA's alternatives analysis. *Cowpasture*, 911 F.3d at 170-73.

Rather than seriously consider an off-forest alternative, the Forest Service and BLM mistakenly assert that they lack the authority to do so. SEIS, 42 [Vol1_Part1_006092] ("To determine and compare the environmental effects associated with the avoidance alternatives . . . is not within the jurisdiction of the Forest Service."). This Court has squarely rejected this argument. *Cowpasture*, 911 F.3d, at 168-173. Neither legal authority nor logic support the proposition that without authority to *regulate* off-forest activities, agencies cannot *evaluate* whether off-forest alternatives would reduce impacts or be reasonable. Indeed, if the Forest Service cannot compare on- and off-forest alternatives, the Forest Service could never apply the Manual's requirement to determine whether any special use could be reasonably accommodated off-forest. The fact that the project here is a gas pipeline subject to FERC jurisdiction does not intrude on the agencies' authority. *Sierra Club*, 897 F.3d at 604.

What little discussion the SEIS *does* provide falls short of the required hard look. A proper evaluation of an alternative requires discussion of technical and economic feasibility and of environmental advantages and disadvantages. *See* SEIS, 30 [Vol1_Part1_006080]

(summarizing the 2017 EIS's evaluation of on-forest routes). The SEIS's discussion of the "Forest Service Avoidance Alternative" does none of this. *Id.*, 39-43 [Vol1_Part1_006089-006093].

The SEIS says *nothing* about the feasibility of an off-forest route. The SEIS notes that this alternative would not be able to make use of the MVP segments that have already been constructed, *id.*, 39, 194 [Vol1_Part1_006089, 006244], but the SEIS explicitly (and appropriately) disclaims reliance on this fact. *Id.*, 209-210 [Vol1_Part1_006259-006260]. The SEIS does not assert that forgoing already-constructed pipeline segments would be infeasible.

Regarding environmental impacts, the SEIS discusses potential harms of an off-forest route while ignoring countervailing benefits. *Id.*, 39-41 [Vol1_Part1_006089-006091]. Notably, the SEIS does not discuss the environmental benefits arising from the avoidance alternative's drastic reduction in new right-of-way (*i.e.*, miles not adjacent to an existing right-of-way).[14] NEPA does not permit a one-sided perspective,

---

[14] The off-forest alternative would only require 19 miles of 'new' (*i.e.*, not adjacent to existing) right-of-way. SEIS, 41 [Vol1_Part1_006091]. Relative to the proposed route, this reduces the length of 'new' right-of-way by over 93%. *Id*. Even where right-of-way has already been cleared for the proposed route, adopting the avoidance

looking only at an alternative's costs or only at benefits. *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs). Perhaps reflecting this cabined perspective, the SEIS does not make any assertions as to whether the avoidance alternative would, on the whole, be environmentally better or worse than the proposed route.

### 2. <u>The SEIS Fails to Demonstrate that Rejection of Certain Alternatives is Justified</u>

Both the Mineral Leasing Act and the Jefferson National Forest Plan require that, insofar as a route *does* cross the National Forest, the route be collocated with existing rights-of-way to the maximum extent practical or feasible. 30 U.S.C. § 185(p), Jefferson Forest Plan Standard FW-247. The SEIS fails to demonstrate that at least three alternatives that would increase collocation are impractical: Alternative 1, Hybrid Alternative 1A, and Columbia Gas of Virginia. Alternatives 1 and Hybrid 1A would entirely avoid new rights-of-way on federal land. SEIS, 184 [Vol1_Part1_006234]. The Columbia Gas of Virginia route

---

alternative would allow this right-of-way to be fully revegetated, whereas the adopting proposed route requires keeping it clear for the life of the project.

would reduce new federal right-of-way and cross the Appalachian Trail at an existing, non-federal crossing. EIS, 3-48–51 [FS-AR-0005675-0005678].

The SEIS interprets "practical" as analogous to "practicable" as used in regulations implementing section 404 of the Clean Water Act. SEIS, 177 [Vol1_Part1_006227] (citing 40 C.F.R. §§ 230.3(*l*), 230.10 (a)). Under these regulations, an alternative is "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Even assuming the agencies' definition is correct, the SEIS fails to provide facts applying it. As Clean Water Act cases illustrate, to show economic impracticality requires more than showing that an alternative costs more: courts require both specific information about *how much* more, *and* a showing that this added expense would render the alternative nonviable, rather than merely less profitable. *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 922 (9th Cir. 2018); *Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1170-71 (10th Cir. 2012). Requiring less—such as a mere showing of *some* added expense or overall length—would

70

effectively nullify the requirement to collocate where practical, because collocation will almost always require an increase in pipeline length and thus cost. *See Carcieri v. Salazar*, 555 U.S. 379, 391 (2009) (rejecting as unreasonable agency interpretation that would render terms of statute surplusage). Meanwhile, to show technical impracticality, the agency must show that the alternative physically cannot be done or would fail to achieve the project's basic purpose. *See Hillsdale Envtl. Loss Prevention*, 702 F.3d at 1168; *Friends of Santa Clara River*, 887 F.3d at 922. The SEIS makes no such showings here. It argues that alternatives 1, Hybrid 1A, and Columbia Gas of Virginia increase overall pipeline distances and crossing of steep and side slopes, among other factors. SEIS, 185-188 [Vol1_Part1_006235-006238]. Nothing in the EIS or SEIS specifies the cost of these alternatives, or suggests that these costs would render the Pipeline economically infeasible. Nor have the agencies shown that these alternatives are technically infeasible. Rather, the agencies implausibly contend both (1) that the proposed route, despite crossing 128.6 miles of steep slope and 158.2 miles of side slope, is technically feasible and will not even "significantly" impact soils or aquatic resources, EIS, 3-24, 4-88, 4-149 [FS-AR-0005651,

0005835, 0005896], and (2) that increasing the amount of difficult terrain crossed by even four miles, or less than three percent overall, would be technically infeasible, EIS, 3-50 [FS-AR-0005676]. The agencies do not explain how such a small increase is the straw that breaks the camel's back.

The SEIS offers a parallel and similarly flawed argument specific to Alternative 1 and Hybrid 1A, which maximize collocation with electric transmission lines. SEIS, 184 [Vol1_Part1_006234]. The SEIS notes that such collocation presents certain risks, but as the SEIS concedes, these risks can be mitigated by placing a pipeline right-of-way adjacent to, rather than completely overlapping, a transmission line. *Id.* The SEIS further notes that some slopes traversed by power lines "may be unsuitable" for pipelines, without addressing whether that is *actually* the case here. SEIS, 185 [Vol1_Part1_006235]. No particular facts demonstrate impracticality here. *See Hillsdale Envtl. Loss Prevention*, 702 F.3d at 1168. The EIS, for its part, indicated that these alternatives were "technically feasible." EIS, 3-119 [FS-AR-0005746].

Finally, the SEIS's assertion that Alternatives 1 and Hybrid 1A fail to meet the project purpose is factually unsupported. These routes

would bypass proposed points for delivery to Roanoke Gas, but nothing in the EIS or SEIS asserts that these alternatives could not deliver gas to this customer at alternative points. SEIS, 179, 186 [Vol1_Part1_006229, 006236], *see also* EIS, 3-21 [FS-AR-0005648] (map).[15]

Because the SEIS agrees that alternatives 1, Hybrid 1A, and Columbia Gas of Virginia would increase collocation on federal lands, but fails to provide any specific facts demonstrating impracticality or violation of the Pipeline's purpose, the agencies' rejection of these alternatives was not justified and therefore violated the Mineral Leasing Act and Jefferson Forest Plan Standard FW-247.

## G. The Forest Service Violated the 2012 Planning Rule

The Forest Plan amendment relaxed eleven forest plan standards for the Pipeline. Of these, it waived three outright. FS-ROD, 3, 6-7 [Vol1_Part1_005422, 005425-005426] (amending standards FW-248 (utility corridors), 6C-026 (old-growth management), and 4A-028

---

[15] Alternatives 1 and Hybrid 1A appear to pass through Roanoke Gas's service territory, indicating that the proposed points for delivery could in fact be relocated. Roanoke Gas, Investor Presentation, at 4 (May 2020), *available at* https://sec.report/Document/0001069533-20-000027/ (last visited Mar. 11, 2021).

(Appalachian National Scenic Trail)). For the others, the Forest Service purported to replace the existing standard with an alternative obligation, typically to follow the plan of development. FS-ROD, 4-7 [Vol1_Part1_005423-005426].

The Forest Service failed to demonstrate that this amendment satisfies the "directly related" substantive requirements of 36 C.F.R. §§ 219.8 through 219.11 (the 2012 Planning Rule). The Forest Service's Planning Rule analysis is factually unsupported, applies the wrong legal standard, and improperly relies on protections applied across the entire forest while only analyzing the action area.

The 2012 Planning Rule, and 2016 Revision, require that when amending a forest plan, the Forest Service must determine which "substantive requirements" of the 2012 Planning Rule are "directly related" to the amendment, and "apply" such requirements "within the scope and scale of the amendment." 36 C.F.R. § 219.13(b)(5). Here, after the remand in *Sierra Club*, the Forest Service determined that the proposed amendment of the Jefferson Forest Plan is "directly related" to, and must comply with, ten substantive requirements of the 2012 Planning Rule. FS-ROD, 25 [Vol1_Part1_005444]. For example, the

amendments that weaken or waive six forest plan standards related to
"soil and riparian resources," *id.* at 4-6 [Vol1_Part1_005423-005425],
are directly related to substantive requirements to "maintain or restore"
"soils," "water quality," "water resources," and "ecological integrity of
riparian areas." SEIS, 122-123 [Vol1_Part1_006172-006173] (citing 36
C.F.R. § 219.8(a)).

Having acknowledged that the amendment *is* directly related to
substantive requirements, the Forest Service concludes that "[t]his
amendment is in full compliance with . . . all applicable substantive
requirements" because it "applied [these requirements] to provide
protection to resources without substantial lessening of protections for
those resources across the JNF." FS-ROD, 25 [Vol1_Part1_005444]; *see
also* SEIS, 122-126 [Vol1_Part1_006172-006176]. This conclusion is
arbitrary for three reasons.

First, the Forest Service has not supported the factual statement
that the amendment will not lead to "substantial lessening of
protections for [affected] resources," for the reasons stated above. FS-
ROD, 25 [Vol1_Part1_005444]. For example, because the Forest Service
does not know how much soil will be lost to erosion, how much sediment

will be deposited in streams, or what the resulting water quality will be, the Forest Service cannot conclude that protection of these resources will not be lessened, or that the amendment satisfies pertinent substantive requirements. 36 C.F.R. §§ 219.8(a)(2)(ii)-(iv) and (b)(i); SEIS, 123 [Vol1_Part1_006173].

Second, the Forest Service ignores the actual legal standard. Avoiding "substantial lessening of protections . . . across the [forest]" is not what the 2012 Planning Rule requires. FS-ROD, 25 [Vol1_Part1_005444]. The quoted language parallels one of the criteria for *identifying whether* a direct relationship exists, 36 C.F.R. § 219.13(b)(5)(ii)(A), but *applying* the "directly related" requirements is a separate analytic step: nothing in the Rule suggests the absence of such "substantial lessening" demonstrates compliance with the substantive requirement.

The 2012 Planning Rule does not simply prohibit backsliding. Rather, the substantive requirements mandate that the Forest Service affirmatively demonstrate that plan elements are sufficient to "maintain or restore" various resources, which is a different question than whether the amended plan lessens whatever protections happened

76

to already be in place. As the Forest Service has explained, "As a general matter, most 1982 rule plans," such as the 2004 Jefferson National Forest Plan at issue here, "will not be consistent with all of the requirements of the 2012 planning rule." 81 Fed. Reg. at 70,376. In particular, the 2012 Planning Rule differs from prior rules by "emphasiz[ing] restoration," requiring that Forest Plans "do more than mitigate harm." 77 Fed. Reg. at 21, 163-64; *see* 36 C.F.R. § 219.8. The Rule's preamble criticized the 1982 rule for "not requir[ing] consideration of these . . . elements." 77 Fed. Reg. at 21,168-69. The Forest Service's ROD entirely fails to consider the 2012 Planning Rule's restoration requirements.

Third, the Forest Service failed to apply the substantive requirements within the "scope and scale" of the amendments. For every substantive requirement other than economic contribution (36 C.F.R. § 219.8(b)(3)), the SEIS asserts that "[t]he scope and scale of the modification of [the standards] is limited to the MVP project which is a 3.5-mile corridor (83 acres) across the JNF, which accounts for about 0.01% of the entire JNF." SEIS, 123-125 [Vol1_Part1-006173-006175]. The SEIS goes on to state that the Pipeline will impact less than 0.03%

of all Old-Growth Communities Associated with Disturbance acres, 0.00007% of the total old growth acres, and 0.01% of all Appalachian National Scenic Trail Corridor acres. *Id.*; *see* [Vol1_Part1_047848, Vol1_Part1_047910] (defining management area prescriptions).

Although the Forest Service has not explained the purpose of these comparisons, the agency appears to contend that the amendments satisfy the 2012 Planning Rule because application of the existing Forest Plan *outside* the defined "scope and scale" will continue to provide the protections mandated by the substantive requirements. But the regulation requires the Forest Service to "apply" the substantive requirements "*within* the scope and scale of the amendment," 36 C.F.R. § 219.13(b)(5) (emphasis added), *i.e.*, to analyze impacts of the amendment to the area actually affected by the amendment. The Forest Service did not do this. More broadly, concluding that "project-specific amendments" satisfy the substantive requirements simply because they impact a narrow geographic scope renders both "the 2012 Planning Rule and the NFMA's Forest Plan consistency requirement . . . meaningless." *Cowpasture*, 911 F.3d at 164.

Even if the Forest Service *could* rely on conditions outside the scope and scale it defined, here the Forest Service has not provided any analysis of conditions outside this area or analysis of whether application of the existing plan is adequately protecting these resources elsewhere. Having defined the "scope and scale" of the amendment as the eighty-three acres within the Pipeline corridor, and limited its analysis to this area, the Forest Service could not rely on protection of resources elsewhere to demonstrate compliance with the substantive requirements.

## VII. CONCLUSION

Based on the errors above, Petitioners request that the court vacate the Forest Service and BLM decisions. Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Vacatur is the appropriate remedy in this case.

Petitioners respectfully request that oral argument be calendared for the next available session.

Respectfully submitted on April 15, 2021.

By:    /s/ Nathan Matthews

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Ankit Jain
Sierra Club
50 F St. NW, Eighth Floor
Washington, DC 20001
571-435-5914
ankit.jain@sierraclub.org

Derek O. Teaney
Benjamin Luckett
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, West Virginia 24901
304-646-1182
dteaney@appalmad.org
bluckett@appalmad.org
*Counsel for Wild Virginia, Sierra Club,
Appalachian Voices, The Wilderness
Society, Preserve Craig, Save Monroe, and
Indian Creek Watershed Association*

William J. Cook
Special Counsel
Cultural Heritage Partners, PLLC
2101 L Street NW, Suite 800
Washington, DC 20037
843-801-3366
will@culturalheritagepartners.com
*Counsel for the Monacan Indian Nation*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this Opening Brief complies with the briefing order filed in this case on March 23, 2021 because this brief has 13,952 words.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

Dated: April 15, 2021

**/s/ Nathan Matthews**
Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5695
nathan.matthews@sierraclub.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2021, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF System, which will automatically send e-mail notification of such filing to all counsel of record.

**/s/ Nathan Matthews**
Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5695
nathan.matthews@sierraclub.org